Thank you, your honors. My name is Mark Warner. I represent Michael Anderson, who is appealing the denial of the Rule 29 motion at the end of the government's case in his trial, where he argued that the government hadn't proven his knowing possession of a machine gun and that a rational jury would not have come to that conclusion either. The government's evidence was this. Pursuant to a search warrant in Mr. Anderson's house, there was found a number of high-quality firearms, 31, thousands of rounds of ammunition, and among these legal firearms, otherwise legal firearms, there was this one that was not. It was a military-style HESI FAL rifle, which had been internally modified to make it fire automatically. And it was outfitted to shoot, had accessories on it. Mr. Warner, was the HESI equipped with a three-position selector switch? It was, but it was only able to rotate to the semi-automatic position. But I thought that expert testimony by the government's lab man from the ATF was that it could fire in fully automatic fashion, even if it was set on safe. The internal modifications were that extensive. Or not very good. Or not very good. It overcame the fact that it was set on semi. Okay. And then in addition to that, the jury saw the weapon itself, which had the forward grip that one usually sees on machine guns, because the barrel tends to rise when you fire it on fully automatic. And they had another FAL that was semi-automatic, so they could compare the two side by side? They did. And the problem, as I said, is that your guy is a collector of guns, so I guess a reasonable juror could infer that he knew something more than the average bearer about weapons. Why isn't all that sufficient enough for the jury to make the inference that he knew it was capable of firing in fully automatic mode? Here's Anderson's points about that. At that point in the trial, no jury would have rashly be found beyond a reasonable doubt that he had shot this just because there was a collection of guns in the house. That wasn't Judge Thomas' question, though. The – yes, Your Honor. The court relied upon – Judge Thomas' question dealt with inferences. Yes. Okay. Regarding knowledge. Yeah. Well, why don't you answer – see if you can answer Judge Thomas' questions. I think it gets to the heart of your – of your appeal. The inference was not sufficient because when you look at other cases where – that are discussed in the briefs where gun collectors were convicted of possessing machine guns, who had extensive numbers of guns, there was a stream of incriminating details in all of those cases that pointed to the jury that during the search, other illegal firearms were fired, clearly pointed out to the jury that this is an illegal scene going on here. None of those cases stand for the proposition that a number of guns in a house by itself means – Well, let me see if I can – to address more specifically the evidence that was presented in this case. Now, for example, Judge – Judge Tallman referred to the handle. What was it? The forward grip. The forward grip. Vertical grip. Okay. Now, was there any evidence that that's a common accessory to machine guns, to a rifle that will fire automatically? I believe Agent Reilly, the agent who saw it, described the accessories as – me and I have used the word common, but accessories that you will see. Well, I mean, was there any evidence that – that with respect to an automatic rifle that you would commonly see a forward grip attached? There is no evidence to that effect, Your Honor. All right. Now, was there any evidence – what was the other – Oh, the three-position switch. The three-position switch. Was there any evidence that – that that's a common feature for an automatic? This particular gun, yes. It retained the three-position switch in its old military style. However, it was only – it can only be rotated to the semi-automatic position. On this particular Hesse, it was – the three-position switch is a – it's a standard feature. Let me put it that way. Is that correct? Yes. That's my understanding. But isn't the only purpose of the third slot to permit it to fire fully automatic? Yes. Because otherwise a safety on a rifle just has two positions. Yes. It's either on or off. Yes. But on this particular style of rifle, that military switch was retained. Well, in light of what you've said in response to Judge Tallman and Judge Pius' questions, I gather you agree that under the Supreme Court Staples case that circumstantial evidence is sufficient to produce evidence of the automatic status of a gun. Is that correct? Not when there's not an external modification that gives a signal to the ordinary user. Is that what Staples said? That's not what Staples said. That's what this Court said in the Herbert case after Staples was assigned. But isn't that a situation that's quite different than this? Aren't you really dealing with the fact that all the government has to do at this point is to show that any rational trier of fact looking at the circumstantial evidence in this case would have been able to find beyond a reasonable doubt that all of the elements of the crime had been committed. Isn't that what you're dealing with here? That's the issue. So, you know, with respect to your client, I mean, I understand your position. You're a good advocate. But the reality is, you know, here's a guy with just all kinds of very high-quality guns, thousands of rounds of ammunition. He admitted that he had been involved in doing some things with this gun. He didn't claim that he had changed it to an automatic status, but he admitted that he had made some of the modifications, did he not? No, Your Honor. I mean, that's the point. Judge Siebel, this motion troubled him, and he reserved ruling on it. And, therefore, he cannot decide this motion past the point where he reserved, which was at the end of the government's case. So what Mr. Anderson testified to was not considered. But still, I guess I'm trying to confine my questions to the evidence that were in the government's case in chief. And I think I forgot to ask you about, I'm not sure what to describe it as. It's the hole for the sear? Yes. Which exists on the HESI but not on the semi-automatic version. Yes. And the jury was shown that during the government's case in chief. They were. And then the question is, would a gun collector, who presumably knows more than I do about firearms, would recognize that there's something different about this weapon from the semi-automatic version? And the nature of the hole is important, too, Your Honor. I mean, it was an eighth-inch hole ahead of the receiver. Which the ATF expert said, well, that means to me that underneath here is a machine gun part. However, he acknowledged himself to other people that may or may not signify that. I mean, he does that for a living. He examines guns to see whether they're automatic for a living. But he himself acknowledged that that's not the case for everybody. The other items, the other guns that they found, they were referred to as collectible or high quality? High quality is how they were described. What were they? What did they consist of? Were they rifles, handguns? Eclectic collection, Your Honor. Rifles, pistols, revolvers. I'm sorry? Rifles, pistols, revolvers. I don't know if there's some shotguns or not. I think there might have been. Kind of covered the whole waterfront. And then there were these two military style rifles that were within that collection. Is there anything unique in the collector world about these particular rifles? I don't know that. Were they high quality collector rifles? The one at issue? Either or both. I don't think they're routinely regarded as highly as like an AK-47 or whatever. They're very heavy weapons. They're not very amenable, quite frankly. Was there any evidence at the ammunition? How many rounds were there, 30,000? There was no testimony that among. Yeah. There was no testimony among all the rounds that were found that there was .308 caliber ammunition there. Is there anything that would preclude the jury from reasonably inferring that Mr. Anderson, as a gun collector, regularly cleaned and inspected all these weapons so as to maintain their high commercial value? Nothing prevented him from inferring that. There was no evidence that he did. No, I understand that. But, I mean, according to Staples, since circumstantial evidence is admissible and can maybe be used in this particular crime, I'm just asking you whether the jury could reasonably infer that. I think that's a big stretch. That he would have regularly cleaned and inspected his guns. The ATF agent was there. He saw it. There was no testimony to that effect. No, I understand. Again, we're talking about circumstantial evidence. We're talking about a reasonable inference. I frankly would have come to a different conclusion. I would have thought that a guy with as much knowledge about guns as your client and who obviously cared a great deal for his collection, that he wouldn't. I would have thought it would have been surprising to suggest that he didn't regularly inspect and clean them. Well, Your Honor, the only example I thought that I'd put in my briefing was, you may not agree with it or not, there's lots of people who have a lot of cars. It doesn't mean they know how they work. It doesn't mean they know how to fix them or anything. But you're not implying that your client doesn't know how these guns work and how to fix them, are you? Well, I'm certainly saying at that point in the trial, the jury had no such knowledge of that whatsoever. Well, they had the weapons in the courtroom. They could see for themselves whether or not the weapons were clean. Yeah. Were there any cobwebs on any of the guns? I don't think so, Your Honor. I didn't think so either. Was there any evidence that he routinely – that he would buy these guns and then sell them and make a profit? No. Okay. You're way over your time. I'm going to let you go. Thanks. I realize there were questions from the panel, but we need to move on. Good morning, Your Honors. My name is Ed Zink. I was trial counsel and I represent the government in this case. Kind of a thin case, wasn't it? That's a fair question. At the Rule 29 stage? At the Rule 29 stage, that's a fair question. We're only talking about Rule 29 and that's it. Yes. Yes. Yes, it was a close case. And clearly the district court was troubled by it. But the district court also recognized that it had the discretion under the Federal rule to take this matter under advisement and consider it, and that's what happened here. In the order that's being appealed from, the district court very deliberately and carefully made, with the benefit of full trial transcript and time, the district court, if he wanted to, could have easily – There wasn't much, you know. Well, I think the reasonable inferences that a jury can make – Because the judge goes on and he listens. He says, I'm going to insist on this. It's proper. You can do that. That's entirely proper. And then even in his – but then he hears the defense side. And in his order, he makes reference to what Mr. Anderson testified to. He did make reference to it. I suggest that, you know, it might have influenced his decision on the Rule 29. I would respectfully disagree with that, Your Honor. Judge Siebel is one of the most experienced trial district courts in the country. His court is well aware of how busy our docket is. He explicitly said in there that if this were the context of a sufficiency of the evidence, then the defense case-in-chief would have answered that easily. But he then discarded it explicitly and turned back to the evidence of the government's case-in-chief. So the issue, the critical issue at the Rule 29 was knowledge. Yes. It's the only issue. So was there any evidence what a typical gun collector of this sort would, you know, does or what knowledge they might have? It doesn't strike me that he was a collector of semiotic rifles or rifles of this nature. He had two of exactly the same type, which was a fact that was important. One was not a machine gun, though, right? Correct. And that was actually a significant fact, Your Honor. Why is that significant here? One was modified and outfitted in a particular way, the Hesse. It had an $800 to $1,000 scope on it. It had the vertical foregrip. Let me ask, is there any evidence that that kind of scope is a common feature of a machine gun? Not to a machine gun, but Agent Mason testified that that exact scope, a Leupold C2 tactical, which is a very high-quality scope, is exactly the type of scope one would want on that exact type of firearm, as opposed to, say, something like a scope that would be placed on a hunting rifle, which would be inappropriate for that gun. But he explicitly testified in the government's case that this is exactly the type and brand of scope that he was going to use. Was there any evidence that Mr. Anderson added the scope to the gun? No, not in the government's case in Chief, Your Honor. The government originally. Go ahead. I don't understand your last answer. I mean, a scope is a scope. Did the agent explain to the jury what was different about this particular scope from the scope on a hunting rifle? Well, a scope is not a scope. In this case, someone put an $800 to $1,000 scope on the rifle in question. The other FAL, which was a DSA, had a different type of scope, and so one could infer from that that the owner of these firearms, Mr. Anderson, outfitted them deliberately, and from that could infer that the HESI was used. Let me ask the question a different way, and I don't even know if this is true. If the scope is mounted closer to the trigger on a weapon that is capable of firing in fully automatic mode, one would think there might be a risk that as the rifle rises that the scope would actually hit the shooter in the eye, so maybe you'd want the scope further down the barrel. I don't know. Was there any testimony like that? After a fashion. That's actually a very perceptive question. A hunting scope on a normal hunting rifle might be this long. Well, it's a great question, but what's the evidence? I'm trying to get the – what did the agent tell the jury? The evidence was Exhibit 1, which was the firearm in question, which had the scope in question. The jury could see it. The scope was actually about this long and mounted down the rifle. So it is located further down the barrel. Absolutely. Absolutely. If this rifle were to be shouldered, for example, the scope might be out here some distance, which is what I'm getting at, that it's the type and appropriate style of scope for this type of rifle, as opposed to a hunting scope, which exactly, Your Honor, is right. It would be back here and it wouldn't be appropriate for that. But it was combined with a gun that had a sling, which suggests it was used. It had an ammo carrier on its stock. Why does having a sling mean that it suggests that it was actually used or fired by Mr. Anderson? Well, first to the used question, there's no point in putting a sling on a gun unless one intends to carry it. There's no point in putting an ammo carrier on the stock unless one intends to put ammunition in the carrier and use it. There's no point to spend extra money and put a vertical foregrip on the front of this type of rifle. And is there any evidence that he expended extra money to put that on the rifle? Not in the government's case in chief, Your Honor. Mr. Chief. Is there any evidence how much he paid for it? Not in the government's case in chief. Is there any evidence how much it would have cost with these additional features as opposed to without these additional features? Yes. The firearms enforcement officer testified that the scope that was on this particular rifle would be valued at between $800 and $1,000 depending on the model. I mean, the rifle, the whole as a package. As a package. He could have bought it with all this stuff attached to it. He could have. That would be a reasonable inference, right? Yes. He did have a number of records, did he not, for a number of his other firearms, purchase and sale records? Yes. He had receipts and other items that documented the sale. The case agent discussed their existence, but we did not offer those to the jury. So did you argue or could the jury infer that, conspicuous by its absence, was any purchase record for this particular weapon? Did not argue that. But I did point out to the district court in the briefing on the Rule 29 issue that there was evidence that he had indicia of ownership, that the firearms were carefully stored, that he preserved receipts. And, again, it goes to the fact that the reasonable inference, giving the benefit to the government, as this Court must do on this standard of review, the reasonable inference is that he cared for these weapons. He had an eye for quality. He had 35,000 rounds of ammunition. No, but there was no evidence. Was there any evidence that that ammunition would be utilized in testing? In the defendant's case in chief, not in the government's case in chief. My question, that wasn't my question. My question was, in your case in chief, did you present evidence that any ammunition could be used in this machine gun? No. Do I understand that the government initially indicted Mr. Anderson with a number of other offenses? No. Did not? We did not. The case agent investigated initially for felon in possession, but due to a lot of research, including rules in this circuit and others, evidently there was a time frame in North Carolina where they restored felons' rights for a short period of time and then re-prohibited them. And I believe it's ATF and Department of Policy. So this was the one and only charge that was ever suggested or made? Yes. Okay. Did the jury have the return on the search warrant? No. And no inventory of what was taken from Mr. Anderson? No, Your Honor. And how about photographs of the weapons and ammunition? The only photographs and weapons that were given to the jury were both of the two weapons, the FALs, so they could compare and contrast and see them with their own eyes, and then photographs of different parts of the HESI FAL to include the internal parts. And then they also got to see the internal parts themselves. An interesting point regarding the internal parts before I sit down, they were extensively modified, and not haphazardly so. The case or the enforcement officer testified that these parts were modified integrally to work with one another to make this weapon fire in fully automatic fashion. Let me ask, would you use particular kinds of tools to make those modifications? I think a gunsmith would use a particular kind of tool appropriate. Was there anybody who was a gunsmith? I'm sorry? Was there any evidence that he was a gunsmith? No. In fact, the modifications made to the parts were crude in nature, and they were rough. The metal had, rather than fine honing finish, it had rough, sharper edges, consistent with someone who perhaps didn't have a lot of gunsmithing knowledge but maybe resorted to some self-help. But did you find any, when you executed the search warrant, did you find any hand tools or any kind of power tools or anything that would suggest that he had the capability of doing the modifications himself? That question wasn't answered either way. And it wasn't testified. Did you find anything of that nature? Not that was listed on the return of the search warrant. Nothing like that was discussed in the government's case. I thought there was some discussion of a Dremel. Yes. The firearms enforcement officer testified that the modifications made to the internal parts were rough in nature, and he thought perhaps they were made with a file or a Dremel tool. A Dremel tool is a small electric tool for modifying metal and a variety of other It's actually its own unit, but it's similar to that. It would be you could put a file on the end of a cordless drill, I suppose, and replicate some of the features. And I assume the jury was told that when the receiver was opened, it was obvious from the shiny surface and the lack of black metal paint that modifications had been made to that part of the weapon. Yes. And that was one of the government's primary arguments to the district court. In addition to that, there's the small external gap on the receiver. And Anderson, from his perspective, diminishes the importance of that. But the significance of it is that the trained expert could look and see the presence of a machine gun safety sear from the outside of the gun. Now, I understand that fact cuts both ways, but it was there. Well, it depends on how sophisticated he is. Yes. If he has no familiarity with firearms at all, he might not have any idea what that slot is for. And I think the evidence would strongly cut the other way, that he has a tremendous amount of familiarity with firearms. So you would distinguish this case from the case involving the woman who dumped the bag in Puerto Rico with the AK-47? That's Nieves Castano, Your Honor. And the difference in this case are the people. She had no knowledge of any guns that anyone believed. And Mr. Anderson, I believe the evidence suggests, had tremendous amount of knowledge about firearms and an eye for quality. Thank you. Thank you, Your Honors. I've got one minute. Okay. Not a second one. There was no evidence that there were receipts for all the rest of the accessories except this one. There were some receipts for some of the stuff and some weren't. So he wasn't a very good record keeper? No.  Judge Siebel, as experienced as he was, also during the rule of law, rule 29 discussion reflected out loud that even if he had looked inside of this, he wouldn't necessarily have known it was a machine gun. So the lack of external modification has become important, I think. Is the judge saying he – Siebel's saying if I looked at it, I wouldn't be able to tell. Right. But the question the jury had to answer is, would somebody who owns 31 weapons and 35,000 rounds of ammunition have more knowledge than our able district judge and bill? There's inferences that say they could or there's inferences that say they may well not. Right. And, Judge, I don't think that meets a beyond a reasonable doubt standard. I think this is a real error. I think this was wrong to go this far with those inferences. The question is whether or not a reasonable jury, looking at all the evidence in totality, could conclude beyond a reasonable doubt that he possessed the mens rea. That's what we have to assess. Right. Just up to that point in time. Up to the rule 29. Up to the rule 29. Thank you. Thanks a lot. Thanks, Mr. Warner. Good to see you. This is United States v. Anderson. It's submitted.
judges: Paez, Tallman, Smith M.